## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:13-CR-109** |
| | : | |
| **v.** | : | **(Chief Judge Conner)** |
| | : | |
| **MARIA COLVARD** | : | |

## MEMORANDUM

Presently before the court is the motion (Doc. 217) for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and for a new trial pursuant to Federal Rule of Criminal Procedure 33 filed by defendant Maria Colvard ("Colvard"). Colvard asserts that the evidence adduced at trial is insufficient to sustain her convictions on Counts I and III of the second superseding indictment, that the jury's verdict on said counts may not have been unanimous, and that the verdict on Counts I, II, and III was against the weight of the evidence. For the reasons that follow, the court will deny the motion.

## I.    Factual Background and Procedural History

On June 5, 2013, a federal grand jury returned a two-count indictment charging Colvard with extortion by a person representing herself to be an officer of the United States in violation of 18 U.S.C. § 872 (Count I) and false personation of an employee of the United States in violation of 18 U.S.C. § 912 (Count II). (Doc. 23). By way of a superseding indictment returned on November 6, 2013, the grand jury also charged Colvard with interference with commerce by threats in violation of 18 U.S.C. § 1951 (Count III). (Doc. 74). On January 15, 2014, the grand jury returned a

second superseding indictment, adding two counts for tampering with a witness in violation of 18 U.S.C. § 1512(b)(1) (Counts IV and V). (Doc. 83). Colvard initially entered a plea of not guilty to all five counts. (Doc. 92).

Colvard and the government subsequently entered into an plea agreement whereby Colvard agreed to plead guilty to Counts II and III of the second superseding indictment. (Doc. 137). The court held a change of plea hearing on January 6, 2015 and accepted the defendant's guilty plea. (Doc. 141). Shortly thereafter, Colvard moved to withdraw her plea. (Doc. 143). The court granted Colvard's motion on the grounds that it could not conclude that certain aspects of her plea were sufficiently "knowing and voluntary." (Doc. 149, 150). The parties proceeded to trial.

A jury trial commenced on June 8, 2015. During its case-in-chief, the government adduced evidence implicating the defendant in an extortionate scheme to frighten Maria Cristina Gutierrez ("Gutierrez") and to acquire certain documents and information from her. Gutierrez had worked at Colvard's tax preparation company in Hanover, Pennsylvania for several years until Colvard terminated her in 2012 for allegedly refusing to sign an employment contract that contained non-compete provisions. (See Doc. 230 at 3:19-6:24). At the time of Gutierrez's termination, Colvard's company was known as Tax Max LLC ("Tax Max"). In January 2013, Gutierrez opened her own tax preparation business in Hanover ("Cristina's Tax Service"). (See id. at 7:25-8:10). Later that month, Colvard delivered correspondence to Gutierrez at Cristina's Tax Service, directing Gutierrez not to contact Colvard's clients, demanding a percentage of Gutierrez's gross

income and receipts pursuant to a former employment contract, and notifying Gutierrez that Colvard was providing information to the Internal Revenue Service ("IRS") about her business practices.  (Id. at 9:25-11:8; Gov't Ex. 1).[1]  Colvard copied the IRS Fraud Department and a Pennsylvania state agency on the letter.  (Gov't Ex. 1).

On February 22, 2013, an individual purporting to be an IRS agent entered Cristina's Tax Service.  The individual identified herself as "LaBella Williams" ("Williams") and provided a business card containing an IRS insignia and an email address with an "irs.gov" domain.  (See Gov't Ex. 5).  Williams conducted the exchange in English; Gutierrez is a Spanish speaker with limited English proficiency.  Williams also recorded the exchange.  She informed Gutierrez that she was there on official business with respect to a "complaint."  (Doc. 230 at 14:10-16; Gov't Ex. 46 at 2).  Williams removed certain documents from the wall of the business and requested information concerning, *inter alia*, Gutierrez's use of the Drake tax preparation software, her federal and state registration status, and her personal tax returns for 2009, 2010, and 2011.  (Doc. 230 at 14:17-24; Gov't Ex. 46 at 3-10).  Williams told Gutierrez that her business was not properly registered with federal and state agencies but that she would afford Gutierrez certain time in which to register.  (Gov't Ex. 46 at 6).  Notably, she also requested a copy of Gutierrez's customer list.  (Id. at 13).  With Gutierrez's consent, Williams printed a copy of her

---

[1] Citations to "Gov't Ex." refer to exhibits that the government introduced at trial, while citations to "Def. Ex." refer to exhibits that the defendant introduced at trial.

customer list from the Drake software on Gutierrez's computer. (Id.) Williams demanded additional registration documentation from Gutierrez within two weeks and averred that noncompliance could result in a $10,000 fine. (Doc. 230 at 15:11-24; Gov't Ex. 46 at 15-17). On March 12, 2013, Gutierrez faxed additional registration-related information to Williams. (Doc. 230 at 21:25-22:13, 25:25-27:20).

Gutierrez subsequently visited a local IRS office regarding issues with her personal tax returns. (Id. at 28:6-20). After Gutierrez described the visit from Williams and displayed Williams's business card, the IRS informed her that no such individual worked for the agency. (Id. at 28:21-29:12). The following day, Gutierrez met with Special Agent Kelly Sopko ("Special Agent Sopko") of the Treasury Inspector General for Tax Administration regarding her encounter with Williams. (Id. at 29:13-30:13). Cooperating with Special Agent Sopko, Gutierrez recorded two telephone calls, to wit: a call placed to Williams's voicemail and a call received from Williams in March 2013. (Id. at 30:22-34:12). On March 29, 2013, Gutierrez received a letter purportedly from Williams stating that her tax return was being audited and requesting copies of receipts in support of deductions. (Id. at 36:21-38:11; Gov't Ex. 23). At the direction of Special Agent Sopko, Gutierrez placed the letter in an envelope and turned it over to authorities. (Doc. 230 at 38:21-39:5).

As part of her cooperation with Special Agent Sopko, Gutierrez reached out to Colvard regarding the alleged investigation. (See id. at 39:9-12). Gutierrez recorded several telephone conversations with Colvard and an in-person meeting with her. (Id. at 47:11-60:6). Colvard suggested that Gutierrez send a fax to Williams requesting an appointment with her. (Id. at 61:18-62:5; Gov't Ex. 34).

Gutierrez asked that Colvard attend. (Doc. 230 at 62:9-21; Gov't Ex. 30). On May 10, 2013, Colvard told Gutierrez that Williams was available to see them that day. (Doc. 230 at 62:22-63:6). Gutierrez, Colvard, and Williams met at Cristina's Tax Service later that morning. (See id. at 63:5-20). As a fluent English and Spanish speaker, Colvard assisted in translating portions of the exchange for Gutierrez. (See Gov't Ex. 40 at 9). Federal agents had equipped the office with audio and video surveillance. (Doc. 230 at 63:9-23). After a lengthy "interview" in which Williams asked for additional tax-related information and persistently requested another copy of Gutierrez's client list, the agents intervened and arrested Williams. (Gov't Ex. 40 at 17-25).

At trial, the government introduced the testimony of codefendant Merarys Paulino ("Paulino"). Paulino acknowledged that she had played the role of Williams. She began working for Colvard in January 2013 at the Chambersburg, Pennsylvania location of Tax Max. (See Doc. 232 at 15:6-9, 17:10-19). Paulino had never met Gutierrez prior to her visit to Cristina's Tax Service. (Id. at 17:20-18:2, 66:13-25). Paulino testified that Colvard instructed her to visit Gutierrez's office as an IRS agent. (Id. at 18:3-15). According to Paulino, Colvard wanted to determine whether Gutierrez was operating her business legally and whether any of Gutierrez's clients were also clients of Tax Max. (Id. at 33:25-34:6, 36:13-22). Colvard conceived of the persona "LaBella Williams," designed the business card that Paulino presented to Gutierrez, and provided the telephone and fax numbers associated with Williams. (Id. at 23:9-24:12). Colvard also created the folder that Paulino brought with her to the visit, which bore an IRS logo, and placed IRS-

5

related documents in the folder. (Id. at 20:10-21:2). After her initial "interview" with Gutierrez, Paulino returned to Colvard's office, gave Colvard the client list and other documents she had collected, and played the audio recording of the encounter. (Id. at 30:1-22, 35:5-15). Paulino testified that Colvard was pleased with what Paulino had accomplished during the visit. (Id. at 35:5-15).

Over the following months, Colvard monitored communications from Gutierrez to Williams and told Paulino how she should respond to Gutierrez. (See id. at 37:9-25, 39:7-15). Colvard was present each time Paulino called Gutierrez under the guise of Williams. (Id. at 38:13-39:6). Colvard also directed Paulino to collect additional information from Gutierrez, including another copy of her customer list, in advance of second interview on May 10, 2013. (Id. at 41:24-43:7; Gov't Ex. 54). Following her arrest, Paulino cooperated with federal authorities. (Doc. 233 at 53:7-54:14).

During trial, the government presented a wealth of audio and video evidence depicting Colvard's and Paulino's interactions with Gutierrez. The government also introduced records and testimony connecting Colvard with Williams's purported contact information. Indeed, IRS records revealed an email from Colvard's personal email address to the fictitious "irs.gov" account prior to Paulino's initial encounter with Gutierrez. (See Gov't Ex. 36). Records from Vonage tied Williams's alleged phone number to a Vonage profile bearing Colvard's subscriber information. (See Gov't Ex. 49).

At the close of the government's case, Colvard moved for judgment of acquittal with respect to Count III of the second superseding indictment. Colvard

argued that the government had not shown that any "property" was taken within the meaning of the Hobbs Act. Focusing on Gutierrez's client list, Colvard asserted that because Gutierrez continued to possess the client information after Paulino printed it from her computer, Paulino's actions did not deprive Gutierrez of any property. Colvard also contended that the government's evidence regarding the connection to interstate commerce was insufficient to sustain a conviction on Count III. The court probed the parties on the issue of property deprivation but, finding the evidence sufficient to convict the defendant under the Hobbs Act, denied her motion.

After a four-day trial, the jury convicted Colvard of aiding and abetting extortion by a person representing herself to be an officer of the United States in violation of 18 U.S.C. § 872 (Count I), aiding and abetting false personation of an employee of the United States in violation of 18 U.S.C. § 912 (Count II), and aiding and abetting interference with commerce by threats in violation of 18 U.S.C. § 1951 (Count III). (Doc. 209). The jury acquitted the defendant of two witness tampering charges in which the government alleged that Colvard intimidated or threatened Paulino to influence her testimony and that she attempted to corruptly persuade Paulino regarding the same. (Id.)

Following her conviction on Counts I through III of the second superseding indictment, Colvard timely renewed her motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, advancing several new arguments, and moved for a new trial pursuant Federal Rule of Criminal Procedure 33 on the

grounds that the jury's verdict on Counts I through III was against the weight of the evidence. (Doc. 217). The motion has been fully briefed and is ripe for disposition.

## II. <u>Legal Standards</u>

On a motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, the court must "determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." <u>United States v. Smith</u>, 294 F.3d 473, 476 (3d Cir. 2002) (quoting <u>United States v. Wolfe</u>, 245 F.3d 257, 262 (3d Cir. 2001)). The court must deny the motion "if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision." <u>United States v. Flores</u>, 454 F.3d 149, 154 (3d Cir. 2006) (quoting <u>United States v. Gambone</u>, 314 F.3d 163, 170 (3d Cir. 2003)). Under this highly deferential standard of review, it is not the court's task to "weigh[] credibility and assign[] weight to the evidence." <u>United States v. Brodie</u>, 403 F.3d 123, 133 (3d Cir. 2005). The decision to overturn a conviction based upon insufficient evidence may only be made "where the prosecution's failure is clear." <u>United States v. Leon</u>, 739 F.2d 885, 890 (3d Cir. 1984) (quoting <u>Burks v. United States</u>, 437 U.S. 1, 17 (1978)).

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). Granting or denying a motion for a new trial "lies within the discretion of the district court." <u>United States v. Cimera</u>, 459 F.3d 452, 458 (3d Cir. 2006). A court evaluating a Rule 33 motion does not view the evidence favorably to the government but instead must "exercise[] its own judgment in assessing the

Government's case." <u>United States v. Johnson</u>, 302 F.3d 139, 150 (3d Cir. 2002).

When reviewing a motion for a new trial based on a "weight of the evidence"

argument, a district court may order a new trial only if the court "believes that

'there is a serious danger that a miscarriage of justice has occurred—that is, that an

innocent person has been convicted.'" <u>United States v. Brennan</u>, 326 F.3d 176, 189

(3d Cir. 2003) (citation omitted).  Rule 33 motions are disfavored and should be

"granted sparingly and only in exceptional cases." <u>United States v. Silveus</u>, 542

F.3d 993, 1005 (3d Cir. 2008) (quoting <u>Gov't of V.I. v. Derricks</u>, 810 F.2d 50, 55 (3d

Cir. 1987)).  Exceptional cases include those in which trial errors "so infected the

jury's deliberations that they had a substantial influence on the outcome of the

trial." <u>United States v. Thorton</u>, 1 F.3d 149, 156 (3d Cir. 1993) (citation omitted).

**III.** **Discussion**

Colvard argues that the evidence adduced at trial is insufficient to convict her

of extortion under Counts I and III (the "extortion counts").  In connection with her

sufficiency of the evidence claims, Colvard also raises an issue concerning jury

unanimity.  Finally, Colvard moves for a new trial on all counts of conviction on the

ground that the jury's verdict was contrary to the weight of the evidence.  The court

considers each of these claims below.

**A.** **Sufficiency of the Evidence**

Colvard advances a number of arguments regarding the sufficiency of the

government's evidence under Counts I and III.  First, she contends that Gutierrez's

client list does not constitute "property" within the meaning of the Hobbs Act and

that the government failed to establish any deprivation of the list.  Second, Colvard

9

states that because Gutierrez's fear of Paulino was unreasonable, a conviction for interference with commerce by threats cannot stand. Third, Colvard argues that the jury improperly convicted her of aiding and abetting Paulino when she did not possess sufficient knowledge of Paulino's conduct and when the evidence did not sufficiently connect her to Paulino's extortionate scheme. Fourth, Colvard suggests that Paulino lacked the requisite *mens rea* to violate the Hobbs Act. Finally, Colvard claims that the government failed to establish that defendants' actions had an effect on interstate commerce. The court will address these contentions *seriatim*.

### 1. *Obtainment of Extortable Property*

Colvard's principal argument is that the evidence is insufficient to sustain her conviction on Counts I and Count III because the government failed to prove beyond a reasonable doubt that defendants obtained Gutierrez's property. Focusing on Gutierrez's client list, Colvard contends that a printed list of customers does not constitute "property" within the meaning of the extortion counts and that defendants did not deprive Gutierrez of any property in acquiring the list. (Doc. 221 at 7). Colvard also invokes the rule of lenity. (Id. at 8-12). Finally, Colvard posits that an employment contract with Gutierrez accorded her a right to obtain information about Gutierrez's clients. (Id. at 7-8).

The Hobbs Act defines "extortion" as "the *obtaining of property* from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (emphasis added). This conception substantially tracks the definition of extortion in the Anti-Racketeering

Act of 1934, a predecessor statute, which in turn largely incorporated the contemporaneous definition of extortion under New York state law.  See Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393, 406 (2003); United States v. Mazzei, 521 F.2d 639, 652-54 (3d Cir. 1975) (en banc) (Gibbons, J., dissenting).  The types of "property" that may be subject to extortion are broad.  Notwithstanding an apparent limitation of extortable property at common law to tangible items with economic value, courts have expanded the notion of property to include both tangible and intangible things of value in light of the ways in which value can inhere in things in modern society.  Brian J. Murray, *Protesters, Extortion, and Coercion: Preventing Rico from Chilling First Amendment Freedoms*, 75 NOTRE DAME L. REV. 691, 704-06, 712-15 (1999).  Indeed, courts have reasoned that property within the meaning of the Hobbs Act extends to, *inter alia*, the labor of an independent contractor, the right to solicit customers, exclusivity agreements, and confidential business information.  See United States v. Thompson, 647 F.3d 180, 186 (5th Cir. 2011); United States v. Gotti, 459 F.3d 296, 320-23 (2d Cir. 2006); United States v. Silver, No. 15-CR-93 VEC, __ F. Supp. 3d __, 2015 WL 4496295, at *3 & n.8 (S.D.N.Y. July 24, 2015).[2]  Properly construed, "property" within the meaning of the Hobbs Act extends to both tangible items with value and "any valuable right considered as a source or element of wealth."  Mackin v. Auberger, 59 F. Supp. 3d 528, 549 (W.D.N.Y. 2014) (quoting United States v. Tropiano, 418 F.2d 1069, 1075-76 (2d Cir.

---

[2] Recent Supreme Court precedent limiting the types of property that may be "obtained" under the Hobbs Act does not disturb these initial assessments of what represents property under the Act.  See Scheidler, 537 U.S. at 402 & n.6.

1969)); see also Scheidler, 537 U.S. at 405 (referring to property as "something of value" (quoting United States v. Nardello, 393 U.S. 286, 290 (1969))).

Viewing the evidence in favor of the verdict, a reasonable juror could easily conclude that a tangible list containing information about the customers of Cristina's Tax Service constitutes valuable property under the Hobbs Act. The list in question provides the names, addresses, and taxpayer identification numbers of more than 200 customers. (Gov't Ex. 6). The government introduced evidence that Colvard was singularly focused on obtaining information about the identities of Gutierrez's clients throughout the extortionate scheme. Paulino testified, for example, that Colvard was "very happy and excited" about the prospect of acquiring another client list from Gutierrez in advance of Paulino's second interview. (See Doc. 232 at 46:18-24). The evidence reveals a sophisticated and protracted plot to obtain Gutierrez's client data from which a jury could infer that Colvard ascribed value to this information. Cf. United States v. DeFries, 43 F.3d 707, 710 (D.C. Cir. 1995) (noting that, in the context of federal mail fraud charges, the fact that union officials expended substantial resources gathering information contained on referendum ballots demonstrated that the information was valuable to the officials). A juror could also infer that Colvard placed value in the list from the evidence that Colvard's and Gutierrez's tax preparation businesses directly competed in the same local market. Indeed, Gutierrez testified that Tax Max

customers approached her in the community regarding their tax issues.  (See Doc. 231 at 35:11-23).[3]

Colvard further argues that the form of the client information forecloses its status as "property" under the Hobbs Act and that the evidence is insufficient to establish the requisite deprivation of property.  (Doc. 221 at 7).  Analyzing the historical trajectory of Hobbs Act extortion, the Supreme Court has instructed that the "obtaining of property" element of the Act requires both an acquisition and deprivation of property.  Scheidler, 537 U.S. at 403-04.  Merely interfering with or depriving a victim of her property, without acquiring the same, is insufficient to sustain a conviction for extortion.  Id. at 404-05.  Property is extortable only if it is capable of being exercised, transferred, or sold.  Sekhar v. United States, 133 S. Ct. 2720, 2726 (2013) (citing Scheidler, 537 U.S. at 405).  Informing the Court's interpretation of the "obtaining" requirement was a concern with preserving the "longstanding distinction between extortion and coercion."  Sekhar, 133 S. Ct. at 2727; see also Scheidler, 537 U.S. at 405-06.  Whereas extortion involves the criminal acquisition of the victim's *property*, coercion results when the victim is forced to take certain *actions*.  See Sekhar, 133 S. Ct. at 2725, 2726 n.4.

---

[3] Colvard contends that because Gutierrez's purported clients were not obligated to use her tax preparation business, the clients cannot be considered "property" under the Hobbs Act.  (Doc. 221 at 8).  Colvard's position is misguided. The issue *sub judice* is whether a document bearing the *identities* of Gutierrez's clients may constitute extortable property, not whether the individual *clients*—or an exclusive relationship therewith—are property.  And contrary to Colvard's assertion (id. at 7), it would not be unreasonable for the jury to assume, given the totality of the trial evidence, that the individuals identified on Gutierrez's client list were actual or potential clients of Cristina's Tax Service.

The Court applied these principles in two recent decisions. In <u>Scheidler</u>, it considered whether petitioners from the Pro-Life Action Network "obtained" the property of abortion clinics when they allegedly engaged in a nationwide conspiracy to shut down the clinics. The respondents—a national nonprofit organization that supported the clinics and two health care centers—claimed on appeal that petitioners obtained the property of the clinics because they sought to control the disposition of the clinics' property. <u>Scheidler</u>, 537 U.S. at 397-98, 401. The Court disagreed. It held that while petitioners clearly interfered with and even deprived respondents of their right to control business assets, they did not acquire "any such property." <u>Id.</u> at 404-05. Accordingly, petitioners' actions did not constitute extortion within the meaning of the Hobbs Act. <u>Id.</u> at 405.

Similarly, <u>Sekhar</u> addressed whether a defendant who attempted to force the general counsel of the New York State Comptroller to recommend that the Comptroller invest in a fund managed by the defendant's firm could be convicted of attempted extortion under the Hobbs Act. 133 S. Ct. at 2723. The court found that the alleged deprivation was significantly more "abstract" than the interference with the property rights at issue in <u>Scheidler</u>. <u>Id.</u> at 2726. Even assuming that the general counsel's right to provide a disinterested legal opinion represented property, the defendant could not sensibly obtain that same right for himself. <u>Id.</u> at 2727 ("No fluent speaker of English would say that 'petitioner *obtained and exercised* the general counsel's right to make a recommendation' . . . ."). The defendant intended to force the general counsel to make a particular

14

recommendation, not to obtain the counsel's property; therefore, his conduct amounted to coercion rather than extortion.  <u>Id.</u>

The foregoing concerns regarding the distinction between extortion and coercion are absent in the case *sub judice*.  Defendants' conduct is more accurately characterized as targeting Gutierrez's property than certain action or nonaction on her part (excepting, of course, action required to comply with Paulino's requests for her property).  And the nature of the property deprivation at issue here is far *less* "abstract," <u>see</u> <u>Sekhar,</u> 133 S. Ct. at 2727, than the deprivations alleged in <u>Scheidler</u> and <u>Sekhar</u>.  The trial evidence reveals that Gutierrez permitted Paulino—who purported to work for the IRS—to print a physical copy of her client list from a computer inside Gutierrez's business.  Paulino testified that she removed this document from the premises and handed it over to Colvard, demonstrating the plain transferability of the list.  (Doc. 232 at 35:5-9).  Paulino also transferred the list to Colvard by email several weeks later.  (<u>See</u> Gov't Ex. 56).[4]  Thus, the evidence was more than sufficient for the jury to conclude that the government proved the

---

[4] This case is readily distinguishable from <u>United States v. McFall</u>, 558 F.3d 951 (9th Cir. 2009), on which Colvard also relies.  In <u>McFall</u>, the court reversed certain Hobbs Act convictions because it found that the defendant could not exercise, and thus could not obtain, the property at issue in that case—another individual's intangible right to submit a bid.  <u>Id.</u> at 957-58.  The property at issue in the instant matter is not similarly incapable of being exercised, transferred, or sold.  Colvard also avers that her Hobbs Act conviction cannot stand because the government did not show that the extortionate scheme deprived Gutierrez of any business or clients.  (<u>See</u> Doc. 221 at 7).  As explained *supra*, however, the evidence supports a finding that defendants deprived Gutierrez of a copy of her client list.  The government need not prove a consequential property deprivation in the form of economic loss beyond this initial deprivation.

"obtaining of property" element beyond a reasonable doubt.  <u>See</u> <u>Sekhar</u>, 133 S. Ct. at 2725; <u>United States v. Traitz</u>, 871 F.2d 368, 390 (3d Cir. 1989).

Colvard contends that the rule of lenity warrants judgment of acquittal on the extortion counts.  She cites a number of cases in which courts have applied this principle.  (Doc. 221 at 8-12).  The rule of lenity requires that courts interpret criminal statutes in favor of defendants.  <u>United States v. Santos</u>, 553 U.S. 507, 514 (2008) (plurality opinion).  Any "tie" must inure to the benefit of the defendant.  <u>Id.</u> However, this rule comes into effect only when there is a "grievous ambiguity or uncertainty" in the statute at issue.  <u>United States v. Salahuddin</u>, 765 F.3d 329, 340 (3d Cir. 2014) (quoting <u>Muscarello v. United States</u>, 524 U.S. 125, 139 (1998)).  In <u>Scheidler</u>, for example, the Court employed this rule in rejecting an overly expansive definition of "obtain" and instead cabined the term to its familiar meaning of "to gain possession of."  537 U.S. at 403 n.8.

The court declines to apply the rule of lenity in the instant action.  Colvard does not specifically identify any statutory ambiguities that would trigger the rule, and the court discerns none.  "Lenity . . . serves only as an aid for resolving an ambiguity; it is not to be used to beget one."  <u>Albernaz v. United States</u>, 450 U.S. 333, 342 (1981).  As <u>Scheidler</u> and its progeny explain, in enacting the Hobbs Act Congress intended to expand liability for extortion beyond public officials but retain the requirement that property be "obtained."  <u>See</u> 537 U.S. at 402-03.  Consistent with this intent, the "obtaining of property" within the meaning of the Act necessitates both an acquisition and deprivation of property.  Whatever the reach of the Hobbs Act as applied to information that exists solely in an intangible form, a

16

tangible list of a business's clients is subject to both acquisition and deprivation and hence falls within the types of extortable property that may be obtained under the Act.[5]

In connection with her deprivation of property claims, Colvard also argues that because many of Gutierrez's clients were also clients of Tax Max, Colvard had a right to access Gutierrez's client list. (Doc. 221 at 8). In support of her position,

---

[5] The foregoing analysis of extortable property and the rule of lenity within the framework of 18 U.S.C. § 1951 reasonably translates to the context of 18 U.S.C. § 872. Under the latter statute, "[w]hoever, being an officer, or employee of the United States or any department or agency thereof, or representing himself to be or assuming to act as such, under color or pretense of office or employment commits or attempts an *act of extortion*" is subject to criminal liability. 18 U.S.C. § 872 (emphasis added). Unlike the Hobbs Act, § 872 does not define "extortion." Nevertheless, § 1951 and § 872 were enacted within several years of each other and share "many substantive similarities." United States v. Stephenson, 895 F.2d 867, 872 (2d Cir. 1990). Indeed, both statutes criminalize extortion by public officials in connection with their office. Compare 18 U.S.C. § 1951 (proscribing interference with commerce by extortion "under color of official right"), with 18 U.S.C. § 872 (proscribing acts of extortion "under color or pretense of office or employment"). In the absence of contrary indications, "Congress intends to incorporate the well-settled meaning of the common-law terms it uses." Sekhar, 133 S. Ct. at 2727 (quoting Neder v. United States, 527 U.S. 1, 23 (1999)). Except to the obvious extent that § 872 expanded criminal liability to private actors who represent themselves to be public officials, the court finds no basis to conclude that "extortion" within the meaning of § 872 departs from its common law definition. See United States v. Altmeyer, 113 F. Supp. 854, 856 (W.D. Pa. 1953) ("[Section 872] adopted the common law meaning of extortion . . . ." (footnote omitted)). But cf. United States v. Sutter, 160 F.2d 754, 756 (7th Cir. 1947) (reasoning that a predecessor statute contemplated extortion "in its common, ordinary sense"). In the Hobbs Act context, the Supreme Court has confirmed that the "under color of official right" provision "continues to mirror the common-law definition." Evans v. United States, 504 U.S. 255 (1992). Given the textual and conceptual similarities between the relevant provisions of § 1951 and § 872, along with the legal precedent regarding extortable property under the Hobbs Act, the court sees no reason to apply a distinct notion of property, or the acquisition or deprivation thereof, to § 872. Hence, the court concludes that the evidence of property obtainment in the instant action is sufficient to sustain Colvard's conviction on Count I.

Colvard points to an employment agreement that Gutierrez signed with Tax Max's predecessor, which contains certain non-compete provisions. (See Gov't Ex. 70). Colvard did not request a jury instruction on a claim of right defense but now implies that this defense warrants overturning her Hobbs Act conviction.

Colvard's argument is unavailing. The Third Circuit has recognized a claim of right defense to Hobbs Act extortion when the threats at issue are economic in nature. United States v. Tobin, 155 F.3d 636, 640 (3d Cir. 1998). This defense removes from the ambit of the Hobbs Act situations involving mutually beneficial "hard bargaining" between private parties and a threat of meritless litigation that bears some relationship to a claimed property right. Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 525-26 (3d Cir. 1998); La Suisse, Societe D'Assurances Sur La Vie v. Kraus, No. 06 CIV. 4404 CM GWG, 2014 WL 3610890, at *9 (S.D.N.Y. July 21, 2014) (citing Tobin, 155 F.3d at 640). When the victim has a preexisting right to be free from wrongful economic threats, however, the defendant may violate the Hobbs Act. See Tobin, 155 F.3d at 640.

The evidence reveals that defendants' actions in the instant matter far surpassed the type of conduct that might justify a claim of right defense. Colvard did not, for example, merely threaten a lawsuit for breach of contract if Gutierrez did not turn over information about her clients. Rather, the government adduced evidence that Colvard implemented an extortionate scheme to obtain that information through imitation of an IRS agent, as well as threats to Gutierrez's business, without reference to alleged contractual obligations. As in Tobin, Gutierrez plainly had a right to be free from such wrongful conduct. Cf. id. at

18

640-41 (finding that defendant's extortionate conduct, which included placing harassing phone calls and threatening unrelated lawsuits, fell within the boundaries of the Hobbs Act). Even assuming that Colvard believed she was entitled to certain information about Gutierrez's clients, the claim of right defense does not assist her under the circumstances.

### 2. *Reasonableness of Gutierrez's Fear*

Colvard asserts that the evidence is insufficient to support a jury finding that Paulino obtained Gutierrez's property by wrongful use of actual or threatened fear under the Hobbs Act. According to Colvard, Paulino never threatened Gutierrez but rather acted in a manner consistent with a legitimate IRS investigation of a business. She also reasons that because Gutierrez would not have been concerned about Paulino's demands but for Paulino's purported identity as an IRS agent, the jury may have improperly considered the Hobbs Act extortion charge under a "color of official right" theory. (Doc. 221 at 13-14).

Colvard's arguments do not withstand scrutiny. The Hobbs Act proscribes extortion by private actors "induced by wrongful use of actual or threatened . . . fear." 18 U.S.C. § 1951(b)(2); see also Evans, 504 U.S. at 255. Fear of economic harm gives rise to criminal liability under the Act. United States v. Inigo, 925 F.2d 641, 649-50 (3d Cir. 1991) (citing United States v. Addonizio, 451 F.2d 49, 72 (3d Cir. 1971)). To convict an individual of extortion by fear of economic harm, the government must prove that the victim's fear of economic loss was sufficient to induce the victim to comply with the actor's extortionate demands. See United States v. Inigo, 925 F.2d 641, 649-50 (3d Cir. 1991). This fear must be "reasonable"

under the circumstances and is assessed from the perspective of the victim. <u>Traitz</u>, 871 F.2d at 391; <u>United States v. Provenzano</u>, 334 F.2d 678, 686-87 (3d Cir. 1964).

At least as it pertains to the February 2013 encounter at Cristina's Tax Service, the trial record offers abundant evidence that Paulino wrongfully threatened Gutierrez with fear of economic harm and that Gutierrez's fear was reasonable. When Paulino visited Cristina's Tax Service on February 22, 2013 under the guise of an IRS agent, she informed Gutierrez that she was conducting an investigation for a "complaint." (Gov't Ex. 46 at 2). Prior to obtaining Gutierrez's client list, Paulino referenced a need to attend court, accused Gutierrez of committing fraud in connection with the registration of her business and with her personal tax returns, and implied that noncompliance with her directives could result in closure of her business. (<u>See</u> <u>id.</u> at 3, 6, 8, 11, 12). Paulino testified that the intention of the scheme was to "scare" Gutierrez. (Doc. 233 at 51:15-19). A rational juror could easily conclude that Paulino threatened Gutierrez with economic harm at this first encounter and that these threats caused Gutierrez to relinquish her client list.

A jury could also find that Gutierrez's fear of economic harm was reasonable under the circumstances. Gutierrez testified that she was immediately worried when Paulino arrived and informed Gutierrez that her business was not properly registered. (Doc. 231 at 46:15-25). Paulino explained that she conversed with Gutierrez in English rather than Spanish to prevent Gutierrez from discovering that she was not an actual official. (<u>See</u> Doc. 232 at 19:20-20:9). Gutierrez's reactions to the February 2013 encounter and her subsequent visit to a local IRS

office evidence a sincere and reasonable belief that Paulino was in fact a government employee and that Paulino had the authority to close or otherwise jeopardize the operation of her business.  That Paulino confronted Gutierrez as an IRS agent rather than as a private citizen does not render her conduct any less wrongful or Gutierrez's fear of economic harm any less reasonable when the very purpose of this deception was to obtain certain information that Gutierrez might otherwise have withheld.[6]  Viewing the circumstances from the perspective of Gutierrez, a rational juror could find that Gutierrez's decision to surrender her customer list was reasonable given the extent and nature of the deception.

Finally, Colvard suggests that the jury may have conflated the ways in which Colvard was charged with extortion under Counts I and III.  (Doc. 221 at 14). Absent "extraordinary circumstances," courts presume that juries follow the instructions provided.  Glenn v. Wynder, 743 F.3d 402, 407 (3d Cir. 2014).  Colvard does not challenge the elements of Counts I and III as presented to the jury and offers no reason to believe that the jury was confused by or transposed the court's instructions on the extortion counts.  The defendant's mere speculation of

_____

[6] Colvard asserts that Gutierrez's fear of economic harm was unreasonable because any such fear necessarily resulted from personal tax discrepancies to which Gutierrez could actually be subject to liability.  (Doc. 238 at 2-3).  Even assuming that a fear of economic harm is reasonable only if it does not stem from existing liabilities—a proposition for which Colvard offers no legal authority—Colvard's position is belied by the trial evidence.  During the February 2013 visit, Paulino's threats clearly extended to purported issues with the registration status of Cristina's Tax Service.  Regardless of whether Paulino "merely acted as any IRS agent might when seeking items purportedly needed as part of the review process" (Doc. 221 at 13), the evidence is plainly sufficient to conclude that Paulino wrongfully induced Gutierrez to transfer her client list through fear of economic harm.

inadvertent transposition does not cast doubt on the jury's adherence to the court's instructions.

### 3. *Aiding and Abetting Liability*

Colvard next challenges the jury's verdict on the charge of aiding and abetting extortion under the Hobbs Act.[7] Specifically, she argues that the evidence presented at trial is insufficient to support a conclusion that she had knowledge of Paulino's offense and performed an act in furtherance thereof with the intent to facilitate its commission, and that the knowledge she obtained was acquired at a time when she could no longer withdraw from the offense. (Doc. 221 at 14-16).

Colvard's position is wholly unpersuasive. With respect to the extortion counts, the court instructed the jury to consider guilt under the theory of aiding and abetting Paulino's commission of extortion. The applicable aiding and abetting statute provides that a defendant who "aids, abets, counsels, commands, induces or procures" the commission of a crime "is punishable as a principal." 18 U.S.C. § 2(a). To convict a defendant for aiding and abetting a crime under this statute, the government must prove "(1) that another committed a substantive offense; and (2) the one charged with aiding and abetting knew of the commission of the substantive offense and acted to facilitate it." United States v. Mercado, 610 F.3d 841, 846 (3d Cir. 2010). To satisfy the second element of this offense, the government must also show (1) an affirmative act in furtherance of the substantive offense and (2) the

---

[7] Colvard discusses the sufficiency of aiding and abetting liability only as to her extortion conviction under 18 U.S.C. § 1951. The court's analysis in this section applies equally to Colvard's conviction for extortion under 18 U.S.C. § 872.

intent to facilitate the commission of that offense.  <u>United States v. Dougherty</u>, No. 14-435, __ F. Supp. 3d __, 2015 WL 1455908, at *24 (E.D. Pa. Mar. 31, 2015) (citing <u>Rosemond v. United States</u>, 134 S. Ct. 1240, 1245 (2014)).  A defendant intends the commission of a crime when she "actively participates in a criminal scheme knowing its extent and character."  <u>Rosemond</u>, 134 S. Ct. at 1249.

The evidence is plainly sufficient to find Colvard criminally liable of aiding and abetting extortion beyond a reasonable doubt.  At trial, Paulino testified that Colvard orchestrated an extortionate scheme to acquire certain tax-related information and documents from Gutierrez.  According to Paulino, Colvard instructed her to confront Gutierrez as an IRS agent, established Paulino's fake identity, created the materials that Paulino brought with her to the first visit to Cristina's Tax Service, directed Paulino to speak with Gutierrez solely in English to maintain an "upper hand" on Gutierrez, and set up the telephone and fax numbers associated with Williams.  (Doc. 232 at 19:20-21:2, 24:8-12; Doc. 233 at 71:20-22).  Business records introduced at trial connected these telephone and fax numbers to Colvard's accounts.  (<u>See</u> Gov't Exs. 49, 50, 51).  These initial acts, among others, constitute evidence of affirmative conduct that facilitated Paulino's commission of extortion in Counts I and III.  They also supply ample evidence of active participation in and knowledge of the scheme to hold Colvard liable for aiding and abetting extortion.  Even after Paulino's initial visit to Cristina's Tax Service in February 2013, Colvard continued to instruct Paulino when and how to communicate with Gutierrez.  (Doc. 232 at 37:9-39:6).

Colvard attempts to cast doubt on the sufficiency of the evidence of aiding and abetting liability by positing that Colvard kept her distance from Gutierrez during the early stages of the scheme. (Doc. 221 at 15-16). Colvard also emphasizes that she translated certain comments that Paulino made to Gutierrez during their May 2013 meeting in a manner that rendered them less ominous. (Id. at 16).[8] Neither of these observations undermines the jury's verdict on aiding and abetting liability. The former is not inconsistent with facilitation of a scheme structured such that a different principal interacted with the victim, and an isolated translation discrepancy hardly justifies overturning the jury's verdict in the face of substantial evidence that Colvard acted with intent to facilitate the scheme.

Finally, acknowledging that she became aware of Paulino's deception by May 10, 2013, Colvard suggests that any action she might have taken at that point in time would implicate her in Paulino's offense. (Doc. 221 at 16). Colvard cites Rosemond for the proposition that, in order to subject a defendant to accomplice liability, the defendant must possess "advance knowledge" of the impending offense with

---

[8] The court presumes that Colvard is referring to Paulino's statement that Gutierrez "cannot be operating in here and . . . needs to close the office" (Gov't Ex. 40 at 22), which defense counsel highlighted during closing arguments.

enough time to withdraw from it.  See 134 S. Ct. at 1249.[9]  Colvard's argument is

premised on the assertion that she did not gain the requisite knowledge of Paulino's

offense until May 10, 2013.  As the court explained *supra*, a rational juror could

easily conclude that Colvard's knowledge and facilitation of Paulino's offenses

began prior to Paulino's initial meeting with Gutierrez.

### 4.    *Mental State of Principal*

As noted *supra*, the court submitted the Hobbs Act charge to the jury under

an aiding and abetting theory of liability.  The court therefore instructed the jury to

determine beyond a reasonable doubt whether Paulino committed the substantive

Hobbs Act offense as a principal.  Colvard argues that the evidence was insufficient

to support a determination that Paulino possessed the requisite mental state to

commit extortion under the Hobbs Act.  (Doc. 221 at 17).  The court disagrees.

In the Third Circuit, a principal commits extortion by fear under the Hobbs

Act if she "knowingly and willfully" obtains the property of another, with her

consent, through wrongful use of fear.  See Traitz, 871 F.2d at 383; United States v.

Driggs, 823 F.2d 52, 54 (3d Cir. 1987).  Consistent with the Third Circuit's conception

of the mental state element of "willfully," the court instructed the jury that to

---

[9] The court notes that the Third Circuit has not yet applied Rosemond's "advance knowledge" requirement to the Hobbs Act.  See Troiano v. Warden Allenwood USP, No. 14-4312, __ F. App'x __, 2015 WL 3514700, at *2 (3d Cir. June 5, 2015) (nonprecedential) ("Rosemond addresses the requirements and jury instructions concerning aiding and abetting a § 924(c) offense, but [appellant's] claim relates to the jury instructions concerning aiding and abetting a Hobbs Act robbery."); see also THIRD CIRCUIT MODEL CRIMINAL JURY INSTRUCTIONS § 7.02 ("[Rosemond] does not seem to change the traditional requirement of specific intent or purpose to further offenses other than the compound § 924(c) offense.").

convict Colvard of aiding and abetting Hobbs Act extortion, it must find beyond a reasonable doubt that Paulino "knew her conduct was unlawful and intended to do something that the law forbids." See THIRD CIRCUIT MODEL CRIMINAL JURY INSTRUCTIONS § 5.05. Neither party contests the court's recitation of the mental state requirements for extortion by fear under the Hobbs Act.

Viewing the evidence in favor of the government, a rational juror could conclude beyond a reasonable doubt that Paulino acted with the requisite mental state to commit extortion by fear. Notwithstanding Colvard's role as the architect of the extortionate scheme, Paulino testified that she was complicit in that scheme.[10] With respect to Paulino's February 2013 visit to Cristina's Tax Service, the evidence reveals that Paulino willingly impersonated an IRS agent, intended to frighten Gutierrez, and threatened Gutierrez and her business with legal and economic consequences if Gutierrez failed to comply with her directives. Paulino conceded that she took significant measures to conceal her deception, including speaking with Gutierrez solely in English, recording her exchange with Gutierrez and taking photographs of the business to appear professional, and fabricating tax-related information she provided to Gutierrez. (See Doc. 232 at 19:20-20:9, 24:13-26:12, 30:7-22). While assuming the persona of a government official, Paulino demanded that Gutierrez relinquish property that a jury could infer Paulino had no right to obtain and Gutierrez had no obligation to provide. After federal agents arrested

---

[10] After Colvard asked Paulino whether she knew anyone who could impersonate an IRS agent, Paulino proposed an individual whom she believed "could do the job." (Doc. 233 at 46:3-7).

Paulino in May 2013, Paulino acknowledged that she was "caught with her pants down." (Doc. 232 at 56:14-18, Doc. 233 at 19:4-8).

Colvard relies on a portion of Paulino's testimony in which Paulino explained that she participated in the scheme because she believed that Gutierrez had wronged Colvard and that she did not know that her actions were "so bad and illegal and everything." (See Doc. 232 at 56:11-57:3). Of course, the jury was entitled to assess the credibility of Paulino's testimony in this regard. It could have plausibly found the evidence of Paulino's substantial role in the scheme sufficiently probative of an intent to disregard the law, despite her apologetic tone. As the Third Circuit has explained, "[t]he evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the [principal] guilty beyond a reasonable doubt." United States v. Caraballo-Rodriguez, 726 F.3d 418, 432 (3d Cir. 2013) (en banc) (first alternation in original) (quoting United States v. Cooper, 567 F.2d 252, 254 (3d Cir. 1977)). Even assuming that the jury credited Paulino's justification, it nevertheless could have inferred that her testimony spoke to the *degree* of her awareness of the unlawful nature of her actions. The jury's determination that Paulino knowingly and willfully obtained the property of Cristina's Tax Service clearly does not "fall below the threshold of bare rationality." Id. at 431 (quoting Coleman v. Johnson, 132 S. Ct. 2060, 2065 (2012)).

### 5. *Effect on Interstate Commerce*

Colvard's final argument regarding the sufficiency of the evidence concerns the impact of the extortionate scheme on interstate commerce. According to Colvard, the government failed to prove beyond a reasonable doubt that defendants' actions had any effect on interstate commerce, as required to sustain a conviction under the Hobbs Act. Colvard avers that Gutierrez's clients were in Pennsylvania and that the street on which Gutierrez's business is now located experiences significantly more traffic than the location of her office during the implementation of the scheme. (Doc. 221 at 17). The government points to, *inter alia*, Gutierrez's use of Drake software, the existence of clients in other states, and the purchase of unneeded tax-related registrations in support of its position that defendant's actions had a sufficient effect on interstate commerce. (Doc. 237 at 7).

Under the Hobbs Act, "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do," is subject to criminal liability. 18 U.S.C. § 1951(a). An effect on interstate commerce is a jurisdictional element of the Hobbs Act. United States v. Powell, 693 F.3d 398, 402 (3d Cir. 2012). In enacting the Hobbs Act, Congress intended to proscribe interference with interstate commerce to the full extent of its constitutional power. Traitz, 871 F.2d at 390 (quoting Mazzei, 521 F.2d at 642); see also Stirone v. United States, 361 U.S. 212, 215 (1960) ("That Act speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence."). The Third Circuit has recognized that

the jurisdictional reach of the Hobbs Act is "coextensive" with the Commerce Clause. <u>United States v. Walker</u>, 657 F.3d 160, 179 (3d Cir. 2011) (quoting <u>United States v. Parkes</u>, 497 F.3d 220, 230 n.8 (2d Cir. 2007)).

Given the scope of the Hobbs Act, proof of a *de minimis* effect on interstate commerce satisfies the Act's jurisdictional requirement. <u>United States v. Clausen</u>, 328 F.3d 708, 711 (3d Cir. 2003). This effect may be actual or merely potential. <u>Powell</u>, 693 F.3d at 402; <u>see</u> <u>also</u> <u>United States v. Haywood</u>, 363 F.3d 200, 210 (3d Cir. 2004) (stating that a "slight, subtle or even potential" interference with interstate commerce is sufficient to uphold a conviction under the Hobbs Act (citation omitted)). In the context of extortion, the government need only show a "reasonably probable effect" on interstate commerce as a consequence of the extortionate conduct. <u>United States v. Urban</u>, 404 F.3d 754, 763 (3d Cir. 2005) (quoting <u>United States v. Cerilli</u>, 603 F.2d 415, 424 (3d Cir. 1979)). The government may meet this burden by demonstrating that the extortionate scheme depleted, however minimally, the assets of the victim's business. <u>Id.</u> at 762-65.

Viewing the evidence in favor of the verdict, the court concludes that the government demonstrated a sufficient nexus to interstate commerce. The government adduced evidence that Cristina's Tax Service was engaged in interstate commerce. Gutierrez testified that she prepared taxes for clients and that at least

some of her customers lived in New York at the time. (See Doc. 230 at 8:15-9:6).[11] She or her husband had obtained certain identification numbers from the IRS. (Gov't Exs. 8, 9). Gutierrez used software by Drake—a company located outside Pennsylvania—to prepare her clients' taxes, and purchased office supplies from a national retailer. (See Doc. 230 at 9:7-20; Doc. 231 at 7:11-17); see also Clausen, 328 F.3d at 712 (finding that a business was engaged in interstate commerce when the business, *inter alia*, was incorporated, received a license from the city, had a checking account, and purchased supplies).[12]

Moreover, the government adduced evidence that the extortionate scheme at issue impacted Gutierrez's business and, in turn, interstate commerce. During her initial visit to Cristina's Tax Service, Paulino alleged that the business was not operating properly and demanded that Gutierrez register with federal and state agencies. (Gov't Ex. 46 at 6). Paulino sought additional registration information from Gutierrez within two weeks, and Gutierrez explained that she spent time obtaining the requested documentation. (Doc. 230 at 18:12-18, 20:25-21:8). A reasonable trier of fact could infer that Gutierrez would have otherwise devoted this time to normal business activities. Furthermore, Gutierrez testified that, by

---

[11] Colvard highlights Gutierrez's testimony that in 2013 her customers were located in Pennsylvania and that nobody questioned her about preparing taxes elsewhere. (See Doc. 231 at 61:13-21). A rational juror could infer from this testimony that Gutierrez filed state taxes on behalf of clients only in Pennsylvania, not that the residences of her clients or potential clients were necessarily confined to Pennsylvania. Indeed, the client list that Paulino obtained from Gutierrez on February 22, 2013 identified clients with addresses in Maryland, New Jersey, and New York, in addition to Pennsylvania. (Gov't Ex. 6).

[12] Special Agent Sopko testified that Drake was headquartered in North Carolina.

complying with Paulino's demands, she obtained registration information that was ultimately not required. (Doc. 231 at 39:19-20, 59:24-60:3). According to Gutierrez, she paid for at least one unnecessary document from the state of Pennsylvania. (Id. at 60:4-61:7). Hence, the jury could have reasonably determined that Gutierrez's business assets were actually depleted—even if to a *de minimis* degree—as a result of her first meeting with Paulino. The evidence introduced at trial is sufficient to satisfy the jurisdictional element of the Hobbs Act. See Urban, 404 F.3d at 762-65.[13]

## B.     Jury Unanimity

Colvard challenges the unanimity of the jury's verdict on Counts I and III. She reasons that because neither the indictment nor the jury instructions explicitly defined the allegedly extorted property, and because the evidence presented at trial referenced multiple communications and meetings between Gutierrez and defendants, "it is impossible to know what 'property' if any the jury agreed upon." (Doc. 221 at 12-13). The government avers that, consistent with its theory of the case, the trial evidence established that Paulino obtained Gutierrez's client list. (Doc. 237 at 5).

---

[13] The court concludes that the evidence regarding Paulino's registration-related demands during her initial visit to Cristina's Tax Service supplies a sufficient nexus to interstate commerce and therefore need not consider the effects of any actual or threatened "closure" of Gutierrez's business. To the extent that Colvard implies that the eventual relocation of Cristina's Tax Service to a busier street in Hanover necessarily forecloses Hobbs Act jurisdiction on the basis of that issue, Third Circuit precedent holds to the contrary. See Traitz, 871 F.2d at 390 ("[T]he impact on interstate commerce may actually be positive or beneficial to interstate commerce.").

Although Colvard advances this argument in connection with her motion for judgment of acquittal, it is not based on the sufficiency of the evidence. See United States v. Otero, No. 11-23 SRC, 2012 WL 2087736, at *2 (D.N.J. June 8, 2012) ("[A] Rule 29 motion can be grounded only in the insufficiency of the evidence to sustain a conviction."), aff'd, 557 F. App'x 146 (3d Cir. 2014). Distilled to its essence, Colvard's position is that the court should have expressly instructed the jury that it must unanimously agree on which property defendants extorted. This argument therefore concerns purported trial error and is appropriately brought under a Rule 33 motion for a new trial. At trial, Colvard failed to object to the court's jury instructions as they related to unanimity or to propose her own unanimity instruction. See FED. R. CRIM. P. 30(d) ("A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate."). Accordingly, her claim is subject to review for plain error. Salahuddin, 765 F.3d at 344; United States v. Wise, 515 F.3d 207, 214 (3d Cir. 2008); United States v. Med. Servs. Corps, Inc., 43 F. Supp. 2d 499, 503 (D. Del. 1999), aff'd in part, vacated in part on other grounds sub nom. United States v. Syme, 276 F.3d 131 (3d Cir. 2002).[14]

---

[14] With respect to the indictment, the court notes that Colvard did not file a pretrial motion to dismiss for lack of specificity under Rule 12(b), nor does she now appear to challenge the validity of the indictment. See United States v. Berk, 652 F.3d 132, 137 n.5 (1st Cir. 2011) (finding that defendant waived his challenge to lack of specificity in the indictment when he failed to raise it by pretrial motion or to develop the argument in his appellate brief).

Under a plain error standard of review, courts consider whether there is "(1) an error; (2) that is plain; and (3) that affected substantial rights." United States v. Dobson, 419 F.3d 231, 236 (3d Cir. 2005). An error is "plain" if it is "obvious" or "clear under current law." Salahuddin, 765 F.3d at 337 (citation omitted). To affect substantial rights, the error must be "prejudicial"—that is, "there must be a reasonable probability that the error affected the outcome of the trial." United States v. Marcus, 560 U.S. 258, 262 (2010) (citing United States v. Olano, 507 U.S. 725, 734-35 (1993)). If each of the foregoing conditions is met, the reviewing court may grant relief only if "the error seriously affects the fairness, integrity, or public reputation of [the] judicial proceedings." Dobson, 419 F.3d at 236 (alteration in original) (citation omitted).

The Constitution guarantees defendants a right to a unanimous jury verdict in federal criminal proceedings. United States v. Yeaman, 194 F.3d 442, 453 (3d Cir. 1999). A jury may not convict a defendant unless it unanimously finds that the government proved each element of a criminal offense. Richardson v. United States, 526 U.S. 813, 817 (1999). In Richardson, for example, the Supreme Court held that unanimity is required with respect to the specific violations that constitute a continuing series of violations within the meaning of 21 U.S.C. § 848, each of which represent a separate element of the offense. Id. at 815. However, a jury need not unanimously agree on the "brute facts" underlying an element of the offense, such as the means by which the defendant committed the offense. Id. at 817. To the extent that the *particular* property extorted is an essential element of Count I

and III, therefore, the jury was required to agree unanimously on the identity of that property.[15]

Colvard's principal authority for her position that the jury's verdict lacked requisite unanimity is <u>United States v. Beros</u>, 833 F.2d 455 (3d Cir. 1987). Applying an abuse of discretion standard rather than plain error review, the Third Circuit considered whether the trial court's failure to give a specific unanimity instruction constituted reversible error when the defendant requested such an instruction. The government in that case charged the defendant with theft- and embezzlement-related offenses. On two of the counts, the indictment alleged multiple theories of criminal liability—"unlawfully embezzle[ing], steal[ing], abstract[ing] and convert[ing]" property of a pension fund—as well as distinct transactions that could apply to those theories, such as using a credit card to pay for airfare and staying in an expensive hotel suite. <u>Id.</u> at 458-61. The district court issued a general unanimity instruction and instructed the jury that it was required to reach a unanimous decision on the "mode or manner" in which the defendant committed the offense, but it did not give a specific instruction requiring unanimity on the individual criminal transactions. <u>Id.</u> at 460.

The Third Circuit affirmed that in most cases, a general unanimity instruction ensures that the jury is unanimous on the specific acts that form the basis for an offense. <u>Id.</u> When, however, case-specific circumstances create a

---

[15] Neither party offers argument or legal authority regarding whether the specific property extorted constitutes an element of 18 U.S.C. § 872 or 18 U.S.C. § 1951. The court will assume for purposes of this memorandum that it does. The court notes that it has been unable to locate any case law addressing this issue.

potential for jury confusion regarding the jury's obligation to reach a unanimous verdict, the district court must provide a specific unanimity instruction.  Id.  In Beros, the Third Circuit found a sufficient potential for jury confusion when, in order to reach a unanimous verdict, the jury was required to "match" a unanimous decision on a criminal theory with a unanimous decision on a criminal act.  Id. at 461-62 ("In this case, the permutations that can support a valid conviction are varied and several.").  The district court therefore erred in failing to give the requested specific unanimity instruction.  Id. at 463.

Such concerns regarding jury confusion are not manifest in the *case judice*. The court provided general unanimity instructions at multiple points during the charge, informing the jury that, *inter alia*, "your verdict, whether it is guilty or not guilty, must be unanimous" and "the answer to each question must be the unanimous answer of the jury."  The jury did not submit questions during its deliberations regarding the property at issue in the extortion counts or exhibit any indicia of confusion regarding its obligation to reach a unanimous verdict on those counts.  In contrast to the factual scenario in Beros, the jury in this case was not tasked with reaching compound unanimous decisions as to theories of criminal liability and specific acts of criminality.  The second superseding indictment does not charge disjunctive modes or manners of committing the extortion offenses.  To be sure, the indictment alleged multiple bases for criminal responsibility in Counts I and III, but the court confined the jury's consideration to aiding and abetting liability to avoid potential duplicity concerns, as it explained during the charge conference.  The indictment is not a model of clarity insofar as it did not identify the

specific property of Cristina's Tax Service that defendants allegedly obtained, but at the same time it does not allege distinct extortionate acts that might engender jury confusion. (See Doc. 83).

The government's theory of the case with respect to the extortion counts clearly centered on defendants' efforts to obtain Gutierrez's client list. Indeed, the prosecution referenced the client list repeatedly during its opening and closing arguments to the exclusion of other documents or information that defendants acquired during the scheme. Consistent with this theory, the evidence presented at trial showed that Colvard was singularly focused on obtaining information about Gutierrez's clients. In light of the narrow nature of the government's theory, the court does not believe that this case is sufficiently complex to warrant a specific unanimity instruction on the particular property extorted. Cf. United States v. Dwyer, 493 F. App'x 313, 318 (3d Cir. 2012) (nonprecedential) (finding no plain error in the trial court's failure to issue a specific unanimity instruction when the government alleged multiple material misstatements in connection with a bankruptcy fraud charge); Med. Servs. Corps, Inc., 43 F. Supp. 2d at 502-04 (holding, under plain error review, that a specific unanimity instruction was not required, even when the government advanced multiple theories of liability, because the case was not complex). Hence, the court finds no meaningful potential for jury confusion in the absence of a specific unanimity instruction and discerns no error in failing to provide such an instruction *sua sponte*. See United States v. Cusumano, 943 F.2d 305, 312 (3d Cir. 1991) ("The Beros rule comes into play only

when the circumstances are such that the jury is likely to be confused as to whether it is required to be unanimous on an essential element.").

### C.    Weight of the Evidence

Colvard moves for a new trial on all counts of conviction on the ground that the jury's verdict was against the weight of the evidence.  (Doc. 221 at 18).  She incorporates her arguments regarding the sufficiency of the evidence on Counts I and III but articulates no independent reasons why the verdict was contrary to the weight of the evidence.  The court concludes that it was not.

At trial, the government introduced substantial documentary, testimonial, and video and audio evidence implicating Colvard in an extortionate scheme designed to obtain Gutierrez's client list and information about her business. Paulino credibly testified that Colvard conceived of the idea to impersonate an IRS agent, created the materials used to facilitate the deception, and directed Paulino how to act and what to obtain as an IRS agent.  Copious business records corroborate Colvard's involvement in the scheme.  During her initial visit to Cristina's Tax Service in February 2013, Paulino invoked her authority as an IRS agent and threatened Gutierrez's business.  The government presented an audio recording of this visit at trial.  In light of Paulino's threats and purported ability to influence IRS matters, Gutierrez relinquished her client list.  Colvard did not present credible evidence that she was entitled to this document.[16]

---

[16] With respect to Count II, which is not at issue in Colvard's motion for judgment of acquittal, the evidence plainly shows that Paulino knowingly impersonated a fictitious federal official, that she demanded a copy of Gutierrez's client list, and that Colvard planned and intended this deception.

After independently assessing the evidence in this case, the court perceives no danger that the jury convicted an innocent person.  See Brennan, 326 F.3d at 189.  Accordingly, the court declines to grant Colvard a new trial based on the weight of the evidence.

**IV.    Conclusion**

For all of the foregoing reasons, the court will deny Colvard's motion (Doc. 217) for judgment of acquittal and a new trial.  An appropriate order follows.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:          September 1, 2015